1  Corey A. Evans (CSB# 218789)
   cevans@evansandpage.com
2  Geneva Page (CSB# 235633)
   gpage@evansandpage.com
3  EVANS & PAGE
   2912 Diamond Street #346
4  San Francisco CA 94131
   ph:  (415) 896-5072
5  fax: (415) 358-5855

6  Attorneys for Plaintiffs
   Gail Profant and Leslie Hemstreet
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10
   GAIL PROFANT, an individual; and       CASE NO.:  2:11-cv-05339-RGK-OP
11 LESLIE HEMSTREET, an individual,

12          Plaintiffs,                    **RESPONSE TO ORDER TO SHOW**
                                           **CAUSE RE: DISMISSAL FOR LACK**
13      v.                                 **OF SUBJECT MATTER**
                                           **JURISDICTION [Dkt. 16]**
14 HAVE TRUNK WILL TRAVEL, INC., a
   corporation; GARY JOHNSON, an
15 individual; KARI JOHNSON, an
   individual; and DOES 1-10,
16
            Defendants.
17

18 /

19 /

20 /

21 /

22 /

23 /

24 /

25 /

26 /

27 /

28 /

# I.   INTRODUCTION

In its October 31, 2011 order to show cause ("OSC"), the Court provided that it was unable to determine whether the jurisdictional amount was satisfied based on the face of the complaint.  The complaint sets forth claims under California's unfair competition law ("UCL"), and false advertising law ("FAL").  Cal. Bus. & Prof. Code §§ 17200 and 17500.  The Court asked plaintiffs Gail Profant and Leslie Hemstreet ("plaintiffs") to explain how the amount in controversy is met for this Court to exercise subject matter jurisdiction.[1]

Plaintiffs seek leave to amend their complaint to include two additional claims, which are relevant to this Court's analysis of subject matter jurisdiction.  Through the process of researching and drafting a response to this Court's OSC, plaintiffs determined that there are two additional claims relevant to the facts of this case: (1) a California statutory claim under the Consumer Legal Remedies Act ("CLRA"), and (2) a federal statutory claim under the Racketeer Influenced & Corrupt Organizations Act ("RICO").  The inclusion of these claims will simplify this Court's inquiry into whether plaintiffs' case is properly before this federal court, and therefore, they are discussed in this response.

As the complaint currently stands, plaintiffs satisfy the amount in controversy requirement of diversity jurisdiction due to the value of the injunction and declaratory relief sought in the complaint.  As further described below, plaintiffs are seeking equitable relief that will prevent defendants from misleading the public.  Plaintiffs believe that the injunction, and/or declaration, will result in a loss to defendants in an amount far exceeding $75,000.

---

[1]   Plaintiffs interpreted this Court's OSC to ask for a more detailed description of the injunctive and declaratory relief sought, as well as a legal explanation of plaintiffs' basis for meeting the amount in controversy requirement.  Plaintiffs did not believe that this Court was requesting admissible evidence and/or declarations at this stage of the proceedings.

# II.    DISCUSSION

## A.    Plaintiffs Seek Leave to Amend

Plaintiffs seek leave to amend the complaint to include two additional claims. These claims directly relate to the OSC because they relate to this Court's subject matter jurisdiction over this matter.  The first additional claim (RICO) is based on a federal statute, thereby making an inquiry into the amount in controversy moot.  The second additional claim (CLRA) carries new monetary remedies, which would be included in plaintiffs' prayer for relief, and are considered when evaluating the amount in controversy.

In the following two sections, plaintiffs provide a brief overview of these additional claims, so that this Court understands the basis for including them in an amended complaint.  An amended complaint would provide much more detail, and factual specificity, than the outline supplied below.

### 1.    Plaintiffs Seek Leave to Amend to Base Jurisdiction on a Federal Question: a RICO Claim

Plaintiffs seek leave to amend their complaint to include a RICO claim.  By allowing plaintiffs leave to amend, this Court need not decide whether diversity jurisdiction is satisfied—since jurisdiction will be based on a federal question.  The following is an overview of RICO and its application to this case.  In summary, defendants' company (Have Trunk Will Travel) engaged, and continues to engage, in fraudulently representing the training of its elephants for the purpose of making money.  Defendants have used the "wires" and the mail as part of their overall scheme.

A civil RICO claim requires: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (known as 'predicate acts') (5) causing injury to plaintiff's 'business or property.'" *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.*, 431 F.3d 353, 361 (9th Cir. 2005) (quoting *Grimmett v. Brown*, 75 F.3d 506, 510

1  (9th Cir.1996) (citing 18 U.S.C. §§ 1964(c), 1962(c))).   A "pattern of racketeering

2  activity" only requires "two acts of racketeering activity" within ten years of each

3  other.  18 U.S.C. § 1961(5).  Plaintiffs' claims of "racketeering activity" can be based

4  on defendants' engaging in mail or wire fraud.  *Bridge v. Phoenix Bond & Indem. Co.*,

5  553 U.S. 639, 639-40.  Mail fraud occurs whenever a person, "having devised or

6  intending to devise any scheme or artifice to defraud," uses the mail "for the purpose

7  of executing such scheme or artifice."  *Id*. at 640 (quoting 18 U.S.C. § 1341).  The

8  gravamen of the offense is the scheme to defraud, and any mailing incident to an

9  essential part of the scheme satisfies the mailing element, even if the mailing contains

10  no false information.  *Id*.  For the purposes of wire fraud, wire includes telephone,

11  facsimile, e-mail, internet, or other wire transmissions of information.  *See United*

12  *States v. Garlick*, 240 F.3d 789, 794 (9th Cir. 2001) (fax); *United States v. Garner*,

13  663 F.2d 834, 838 (9th Cir. 1981) (telephone); *Tate v. Pacific Gas & Elec. Co.*, 230 F.

14  Supp. 2d 1072, 1084 (N.D. Cal. 2002) (internet and e-mail).  RICO provides a private

15  right of action for treble damages to "[a]ny person injured in his business or property

16  by reason of a violation."  *Bridge*, 553 U.S. at 639-40 (quoting 18 U.S.C. § 1946(c)).

17      In an amended complaint, plaintiffs will supply the court with allegations

18  demonstrating that each element of RICO has been met by defendants' pattern and

19  practice of fraudulent representations, and plaintiffs' resultant injury.  Further, as

20  already alleged in the complaint, defendants' have used email, telephones, and

21  websites to assist them in their scheme.  Compl. ¶¶31, 77.

22      2.    Plaintiffs' Seek Leave to Amend to Plead a CLRA Claim

23      Plaintiffs seek leave to amend their complaint to include a claim based on

24  California's CLRA.  Cal. Civ. Code §§ 1750 *et seq*.  This additional claim is relevant

25  to this Court's analysis of the amount in controversy because it specifically allows for

26  the recovery of attorney's fee.  *Id*. § 1780.  Attorney's fees may be considered as part

27  of the amount in controversy when they are provided for by statute.  *Lowdermilk v.*

28  *U.S. Bank Nat'l Ass'n*, 479 F.3d 994 (9th Cir. 2007); *see Galt G/S v. JSS Scandinavia*,

142 F.3d 1150, 1155-56 (9th Cir. 1998) ("[W]here an underlying statute authorizes an award of attorneys' fees, either with mandatory or discretionary language, such fees may be included in the amount in controversy.")  At this point in the litigation, the reasonable value of the attorney's fees already exceeds $75,000.[2]  The following is an overview of the CLRA and why plaintiffs can state a claim against defendants.

The purpose of the CLRA is "to protect consumers against unfair and deceptive business practices . . . ."  Cal. Civ. Code § 1760.   The CLRA bans any unfair methods of competition and unfair or deceptive acts or practices, and in particular, it prohibits defendants from:  (1) "[r]epresenting that goods or services have . . . characteristics, [or] benefits . . . which they do not have . . .."; (2) "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another"; (3) "[a]dvertising goods or services with intent not to sell them as advertised"; and (4) "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." *Id.* § 1770(a)(5), (a)(7), (a)(9), and (a)(16).

In this case, defendants deceived, and continue to deceive, consumers by deceptively representing that they train their elephants humanely, when in fact, defendants beat and electrically-stun the elephants into submission.  Compl. ¶ 31.  Defendants claim that a particular elephant was never hit or beat in any way, when in fact, the evidence demonstrates that the particular elephant was hit, beat, and electrically stunned.  *Id.* ¶ 32.  Defendants have even specifically stated that they do not condone the use of electricity to train elephants, despite video evidence to the contrary.  *Id.* ¶ 75(b).  Defendants advertised that they train their elephants humanely, while knowing that their training methods violate California's animal cruelty laws applicable to elephant handling.[3]  Clearly, defendants are misrepresenting the quality

---

[2]      See declaration of Corey Evans ¶ 3, appended to this response.

[3]      California Penal Code § 596.5 states: "It shall be a misdemeanor for any owner or manager of an elephant to engage in abusive behavior towards the elephant,

of the services (animal training) and goods (elephants for movies) that they are providing; further, they are representing that their services and goods are of a higher quality than what is provided. An analogous business transaction would be a consumer buying "free range" and/or "organic" eggs, when in fact the eggs were from the worst factory-farm, and were neither free range, nor organic.

Defendants' business model hinges on convincing the public that these endangered species are trained on marshmallows and jelly beans, and treated as children are treated by their parents. Compl. ¶ 56. Defendants lie to the public because defendants know that the public will only support defendants if the public believes that the animals are trained humanely. *Id*. ¶¶ 19-20, 29, 55. The reality is that these endangered species, including baby elephants, are beaten and electrified, all the while the public pays money to defendants. *Id*. ¶¶ 21-23, 28, 54.

In an amended complaint, plaintiffs would seek an injunction under the CLRA against defendants' continued misrepresentations to the public, and violations of California law.[4] Specifically, plaintiffs would request that this Court enjoin defendants from using electrical stun devices on elephants in California, which the California Penal Code prohibits. Additionally, plaintiffs would request that this Court enjoin defendants from making false and misleading representations concerning the treatment of their elephants.[5]

---

which behavior shall include the discipline of the elephant by any of the following methods: . . . (b) Use of electricity."

[4]      The CLRA requires a consumer to give a defendant thirty days notice, prior to suing for "damages." *Outboard Marine Corp. v. Super.Ct.*, 52 Cal.App.3d 30, 41 (1975). However, the thirty day notice is not applicable to lawsuits seeking injunctions. Bus. & Prof. C. § 17200 Ch. 10-J. Further, the provision providing attorney's fees does not categorize them as damages.

[5]      Requesting injunctive relief to prohibit defendant from making "false and misleading misrepresentations" is a valid form of relief in a CLRA, UCL and FAL action brought by a consumer.

1    **B.    The Current Complaint Satisfies the Amount in Controversy Requirement**

2    1.    "Either Viewpoint" Rule

3    For purposes of calculating the amount in controversy, "the test for determining

4    the amount in controversy is the pecuniary interest to either party which the judgment

5    would directly produce." *In re Ford Motor Co./Citibank (South Dakota)*, *N.A.*, 264

6    F.3d 952, 958 (9th Cir. 2001); *see Riddler Bros., Inc. v. Blethen*, 142 F.2d 395, 399

7    (9th Cir. 1944) ("The value of the thing sought to be accomplished by the action may

8    relate to either or any party to the action.")[6]  This is known as the "either viewpoint"

9    rule.  *In re Ford*, 264 F.3d at 958; *see Mangini v. R.J. Reynolds Tobacco Co.*, 793 F.

10   Supp. 925, 928 (N.D. Cal. 1992) ("[I]n non-class action cases, the amount in

11   controversy may be measured either by the value of the relief sought by the plaintiff

12   or the cost to the defendant if the relief is granted.")

13   Here, the value of the relief plaintiffs seek can be measured from defendants'

14   viewpoint.  From defendant's viewpoint, the jurisdictional requirement is met because

15   the detriment to defendants in complying with the relief that plaintiffs seek, which

16   includes injunctive and declaratory relief, exceeds $75,000.  With the "either

17   viewpoint" rule in effect, plaintiffs satisfy the jurisdictional amount in controversy

18   based on their claims for: (1) injunctive and declaratory relief; and (2) attorney's fees.[7]

19

20   [6]    *But see Snow v. Ford Motor Co.*, 561 F.2d 787 (9th Cir. 1977) (declining to

21   apply *Ridder* in class action suit seeking damages and injunctive relief); *see Myers v.

     Merrill Lynch & Co., Inc.*, No. C-98-3532 WHO, 1999 WL 696082, at *4 (N.D. Cal.

22   Aug. 23, 1999) ("[T]he *Ridder* decision in the nonclass action context is not

23   superseded, as the Ninth Circuit recently reaffirmed the vitality of *Ridder* in its

     discussion of a plaintiff's claim for disgorgement of profits under § 17200" in

24   *Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 405 n.6 (9th Cir. 1996)).

25   [7]    Because the Court notes in its order that plaintiffs seek the value of the movie

26   tickets they purchased for *Water for Elephants*, plaintiffs will not discuss restitution

     further.  *See* Cal. Bus. & Prof. § 17203 (a party found to have violated the UCL may

27   be required to "restore to a person in interest any money or property, real or personal,

28   which may have been acquired by means of such unfair competition").

2.     <u>Injunction and Declaratory Relief</u>

        *a.*     *Valuing Injunctive & Declaratory Relief for Diversity Jurisdiction*

Where a lawsuit seeks declaratory or injunctive relief, "it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 347 (1977); *Cohn v. Petsmart, Inc.*, 281 F.3d 837 (9th Cir. 2002) (in actions seeking injunctive or declaratory relief, the amount in controversy is measured for purposes of diversity jurisdiction by the value of the object of the litigation); *In re Ford*, 264 F.3d at 958 ("In *Sanchez*, we observed en banc that *Ridder* . . . rejected the 'plaintiff-viewpoint' rule, which states that courts attempting to determine the value of a claim for purposes of the amount in controversy requirement should look only to the benefit to the plaintiff, rather than to the potential loss to the defendant." (citation omitted)).[8]

It appears to be well settled that the criterion of jurisdictional amount in suits to restrain wrongful competitive activities or trade practices is the value or extent of the business affected or the rights or property to be protected (often referred to as the "object" sought, or to be protected).  *See Gen. Petroleum Corp. v. Beanblossom*, 47 F.2d 826 (9th Cir. 1931).  "The value of an injunction may not be capable of precise determination, but precision is not required."  *Luna v. Kemira Specialty, Inc.*, 575 F. Supp. 2d 1166, 1172 (quoting *Mailwaukee Mailing, Shipment & Equip., Inc. v. Neopost, Inc.*, 259 F.Supp.2d 769, 772 (E.D. Wis. 2003)).  Accordingly, the value of the matter in dispute will be tested either by the value of that which plaintiff seeks to gain or which defendant will lose as the event of the suit.

---

[8]    *Int'l Padi, Inc. v. Diverlink*, No. 03-56478, -- Fed. Appx. --, 2005 WL 1635347, at *1 (9th Cir. July 13, 2005) (Unpub. Disp.) ("[I]n determining the amount in controversy, we may also include the value of the requested injunctive relief to either party.")

EVANS & PAGE
SAN FRANCISCO

*b.*      *Injunction and Declaratory Relief Sought by Plaintiffs*[9]

Plaintiffs request that this Court enjoin defendants from using electrical stun devices on elephants in California—an illegal activity under the California Penal Code.  Cal. Penal Code § 596.5.  Additionally, plaintiffs request that this Court enjoin defendants from making false and misleading representations concerning the training of their elephants.  Plaintiffs request that this Court enjoin defendants from advertising themselves as AZA certified so long as they continue to use electric devices to train elephants (since AZA certification implies that the organization abides by AZA rules).  Compl. ¶ 42.

Plaintiffs request that this Court issue declaratory relief stating that defendants have previously misrepresented defendants' training of the elephants; specifically, defendants' training was more aggressive and abusive than defendants advertised to the public.  Plaintiffs request declaratory relief stating that defendants violated California's Penal Code § 596.5 in their method of training with stun guns.  Plaintiffs request declaratory relief stating that defendants' training method of electrifying elephants is not in conformity with AZA certification standards.[10]  Further, plaintiffs request that this Court declare that Tai was hit and stunned as part of defendants' training.  Lastly, plaintiffs seek declaratory relief stating that defendants misled the public when defendants claimed that they do not condone the use of electrical devices to discipline and control elephants.

---

[9]      Plaintiffs recognize that the complaint's claims for declaratory and injunctive relief were uncertain and would like the opportunity to amend the complaint to specify the relief sought, and also include the additional causes of action (CLRA and RICO).

[10]      Defendants hold out to the public that they are AZA certified.  As a certified AZA member, defendants are required to follow AZA guidelines.  AZA guidelines state that certified members must not use electric prods for training elephants. Compl. ¶ 42.

1          *c.*     *Value of the Injunction and Declaratory Relief Sought by Plaintiffs*

2         Here, the value of the object of the litigation is defendants' continued ability to

3 lie to the public that they train endangered species humanely with marshmallows and

4 jelly beans, as if the elephants were their children; when in fact, the elephants are

5 treated so abusively that it violates the California Penal Code's animal cruelty laws

6 relating to elephant handling.

7         In this case, defendants generate over $75,000 in profits from their unfair

8 business practices and unfair advertising scheme. Defendants lie to the public in

9 advertising and promotions in an overall scheme to deceive the public into believing

10 that their elephants are humanely treated. This scheme is their business model – if

11 people believe that defendants' elephants are trained on jelly beans and

12 marshmallows, then people will see movies that showcase elephants, thereby allowing

13 defendants to receive more business from the movie industry. Compl. ¶¶19, 20.

14 Defendants' whole business model is to sell the idea of humane treatment. The better

15 the movies do, the more movies will feature defendants' elephants, and the higher

16 defendants can set their prices as the number one supplier of elephants for movies.

17 *See id*. ¶ 17 (defendants "take credit for most of the Asian elephant work currently

18 seen in North American television and movies"). Plaintiffs allege that they, and

19 members of the consuming public, are likely to be deceived or misled by defendants'

20 statements regarding humane treatment of their elephants. *Id*. ¶¶ 49, 84-85.

21         As the leader in the entertainment industry of providing elephants, defendants

22 will lose substantial profits if they are no longer able to promote themselves as the

23 "humane" choice for elephants in movies. Defendants' elephants are responsible for

24 more than $75,000 in revenue to defendants. *See Luna v. Kemira Specialty, Inc*., 575

25 F. Supp. 2d 1166 (C.D. Cal. 2008) (the amount in controversy was satisfied in an

26 action filed by an employee against an employer seeking only injunctive relief under

27 state law); *Mahoney v. Depuy Orthopaedics, Inc.*, No. CIV F 07-1321 AWI SMS,

28 2007 WL 3341389, at *1-3, 5 (E.D. Cal. Nov. 8, 2007) (finding that although

1  defendant did not specify the exact amount of net profits generated by plaintiff,

2  defendant satisfied the jurisdictional requirement by inferring that plaintiff's sales

3  must have generated more than $75,000 in net profits for defendant).  Only discovery

4  will reveal how much the elephants generate for defendants.  However, considering

5  that the elephants are defendants' major source of profits, and defendants claim that

6  they "can take credit for most of the Asian elephant work currently seen in North

7  American television and movies," this Court can easily infer that the elephants

8  generate more than $75,000 for defendants.  Compl. ¶ 17; *see Davis v. Advanced Care*

9  *Technologies, Inc.*, CIV S 06-02449 DFL DAD, 2007 WL 1302736, at *2 (E.D. Cal.

10  May 2, 2007) (inferring based on "the undisputed nature and scale of defendants'

11  business," that the value of the information surely exceeded $75,000).

12        3.   <u>Attorney's Fees</u>

13      Although California Business & Professions Code §§ 17200 and 17500 do not

14  specifically provide for recovery of reasonable attorney's fees, there are a number of

15  decisions awarding attorney's fees under California Code of Civil Procedure § 1021.5

16  for suits brought pursuant to Sections 17200 and 17500.  *See, e.g.*, *Ramos v.*

17  *Countrywide Home Loans*, 82 Cal.App.4th 615, 620 (2000); *Lealao v. Beneficial Cal.,*

18  *Inc.*, 82 Cal.App.4th 19, 41 (2000); *Consumers Union of U.S., Inc. v. Alta-Dena*

19  *Certified Dairy*, 4 Cal.App.4th 963 (1992).  A seminal case discussing attorney's fee

20  awards in UCL cases is *Beasley v. Wells Fargo Bank*, 235 Cal.App.3d 1407 (1991),

21  overruled on another ground in *Olson v. Auto. Club of S. Calif.* (2008) 42 Cal.4th

22  1142, 1151.  As stated above, attorney's fees are considered as part of the amount in

23  controversy.  *Galt G/S*, *supra*, 142 F.3d at 1155-56 ("[W]here an underlying statute

24  authorizes an award of attorneys' fees, either with mandatory or discretionary

25  language, such fees may be included in the amount in controversy.")

26      Here, the amount of attorney's fees already exceeds $75,000.  Evans Decl. ¶ 3.

27  /

28  /

EVANS & PAGE
SAN FRANCISCO

## III.   CONCLUSION

Plaintiffs' seek in good faith to have this Court resolve a dispute that concerns an amount in controversy exceeding $75,000, and plaintiffs request leave to file an amended complaint to include additional claims based on the same operative facts presented in the current complaint.

Dated: November 5, 2011                    By: /s/ Corey Evans
                                               Corey Evans
                                               Attorney for Plaintiffs


## DECLARATION OF COREY EVANS IN SUPPORT OF THIS RESPONSE

I, Corey Evans, declare that:

1.     I am an attorney for plaintiffs in the above-entitled case.

2.     I am licensed and in good standing to practice law in the State of California and in the Central District of California.

3.     The amount of hours logged to date in this case, multiplied by the prevailing and reasonable hourly rate of the attorneys working on this case, results in attorney's fees exceeding $75,000 in value.

4.     On Friday, November 4, 2011, I called the Court's clerk to ask about the deadline for filing this response based on the OSC's language "five days following the issuing of this order."  The clerk assured me that the deadline for filing was Saturday, November 5.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: November 5, 2011                    By: /s/ Corey Evans
                                               Corey Evans
                                               Attorney for Plaintiffs

/

/////

1

## CERTIFICATE OF SERVICE CM/ECF

2   I hereby certify under penalty of perjury that on November 5, 2011, I

3 electronically filed the foregoing document entitled RESPONSE TO ORDER TO

4 SHOW CAUSE RE: DISMISSAL FOR LACK OF SUBJECT MATTER

5 JURISDICTION with the Clerk of the United States District Court, Central District of

6 California, by using the Court's CM/ECF system.

7   All participants in the case are registered CM/ECF users and service will be

8 accomplished by the United States District Court Central District's CM/ECF System.

9 Dated: November 5, 2011     /s/ Corey Evans_____

                Corey A. Evans

10               Attorney for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28